### GAY *et al.* v. SANDERS.

1. A paper intended as a last will, but which was attested by only one witness, is void as a will and is not entitled to probate and record as such; and a judgment ordering its probate gives it no effect as a will in any proceeding where its validity may be called in question.
2. Where certain heirs at law of an intestate agreed in writing to the probate as a will of such a paper, and under such agreement it was probated by the ordinary, and a named executor proceeded to dispose of the estate thereunder, such distribution would, because of the agreement, be binding on the heirs who were sui juris and consented thereto; but minor heirs of the intestate are in no way bound thereby.

3. This court must deal with the judgment of the court below as it appears in the record. Where a certificate of the presiding judge is attached, that although the judgment rendered was one of nonsuit, yet he intended to direct a verdict, only the judgment as it appears in the record will be considered. In this case, however, either the direction of a verdict or the grant of a nonsuit was error.

Argued June 1,—Decided July 8, 1897.

Complaint. Before Judge Sheffield. Clay superior court. September term, 1896.

On December 23, 1893, the four children of Allen Gay by his last wife brought suit against I. J. Sanders as executor de son tort, alleging (in brief) that Allen Gay died intestate, leaving an estate of realty and personalty which defendant received and applied to his own use, or wasted, and never accounted therefor. Upon the introduction of evidence by both plaintiffs and defendant, an order was passed granting a nonsuit, and the plaintiffs excepted. The trial judge explains that his intention was to direct a verdict for the defendant, and that the signing by him of the order of nonsuit was inadvertent.

Allen Gay died in 1872, leaving a widow and four children by her (the plaintiffs), and three children by a former marriage, one of these three being the wife of defendant. One of the plaintiffs was then about six, another eight or nine years old; the ages of the other two not appearing. A paper purporting to be the last will of Allen Gay, dated November 2, 1867, but having only one witness, Dennis M. Wade, was probated upon the affidavit of Wade, under a written agreement executed by W. G. Gay, Lewis Gay, D. C. Andrews (husband of a daughter of the deceased), and defendant, in the presence of two witnesses, one signing as N. P. and ex off. J. P., stating that "we, the undersigned heirs and distributees of the estate of Allen Gay, late of said county, deceased, being each and all of us of age, and being cognizant of the defective execution of the instrument annexed, the same being, as we believe, the last will and testament of our dead father (the said Allen Gay), in consequence of the affection we had for him while living, and the reverence we entertain for his memory now that he is dead, do hereby waive all defects and accept

the same as the last will and testament of our deceased father, and do consent and agree for the ordinary of Clay county to have the same probated on the testimony of Dennis M. Wade, admitted to record, and that letters testamentary issue in due form, all of which we accept as binding upon us and our representatives." The purported will bequeathed, after payment of debts, the residue of the estate to Rufus J. and Marcus J. Gay (who are two of the plaintiffs) and any other children born to the testator after the making of his will; directed that his wife receive a decent support "during her widowhood or natural life and good behavior"; stated that his older children, having received what he thought was their share of his estate, and having arrived at majority, are for that reason not mentioned in this will; and directed his executors to keep his estate together, both real and personal, until his youngest child arrived at age, provided it could be done without injury to his estate. The will appointed I. J. Sanders and D. C. Andrews as executors. Andrews refused to have anything to do with the estate, because it was inconvenient for him to do so at the time. He signed for his wife the agreement before set out. Defendant Sanders took charge of the estate as executor, at the request of the testator's widow. Letters testamentary issued to him, dated October 7, 1872. Upon his application there was an appraisement of the estate, dated October 11, 1872, showing personalty amounting to $782; 398 acres of land valued at $400; a mill, gin and screw, valued at $600. On July 1, 1873, defendant as executor made an annual return to the court of ordinary, charging himself with six items of amounts received, aggregating $384; and crediting himself with seven items of amounts paid out, aggregating $430, and with $20.36 commissions. The debits include amounts received for two bales of cotton, a cow and two notes, the rest being stated merely as amounts received from individuals named. The first credit is $45 paid for a coffin. Two others amounting to $96.69 appear from the vouchers to be for accounts, no items thereof nor proof of their correctness being given. The fourth appears by the voucher to be an account against the executor for bagging and jeans. The fifth is an

account for medical services on six dates in September, 1872. The sixth is a note for $20; and the seventh is an account against the executor for $235.35, itemized thus:

| | | |
|---|---|--:|
| To 41 yards homespun | . . . . . . . . $ | 4.80 |
| " Bagging and ties for crop | . . . . . . | 4.80 |
| " Coffee $2, flour $1.50, soda 20c., nails $2.20 | | 5.90 |
| " Amount of State and county tax | . . . . | 13.00 |
| " Flour $1.25, repairing stillyards 75c. | . . | 2.00 |
| " Balance on bacon $1.40, 1 p'r shoes $1.50 | . | 2.90 |
| " Repairing grist-mill | . . . . . . . . | 83.50 |
| " Amt. paid Frank Neelly for attending mill | . | 116.25 |

There was an execution in favor of Fleming, administrator of T. B. Andrews, against Allen Gay, for $100 principal, and cost, which was levied on about 200 acres of the land of the estate, which was sold by the sheriff under this levy to R. H. Powell for $100; the sheriff's deed reciting: "This lot of land was sold subject to an encumbrance of a fifty-acre homestead which has been applied for by Irwin J. Sanders as the next friend of the widow of A. Gay, which homestead has not been laid off." In September, 1887, Powell obtained judgment for the recovery of this lot of land from the widow of Gay. Gay gave to his three older children their shares of his estate before he died; and defendant shortly afterwards so stated. D. C. Andrews testified that there was an instrument of writing signed by the older heirs of Gay, containing a release of their interest in all the remaining property of his estate. Witness signed it for his wife. The paper when he last saw it was in the possession of defendant. Gay at the time of his death owned a plantation of two lots of land, with grist-mill and cotton-gin, both run by water. His personalty consisted of a horse, several head of cattle, hogs, sheep, goats, a buggy and a large wagon. He gave his first children a settlement of land and some personal property to each, which they understood to be their portion of his estate. They afterwards sold and divided the land. Rufus J. Gay testified that his father died seized and possessed of about 395 acres of land, one horse, a four-horse wagon, one ox, about 18 head of cattle, 75 head of sheep, some goats, and a number of hogs. There was a

plantation of about 75 acres, worth about four bales of cotton per year rent. The income from the mill was about $150 per year above expenses; from the gin about $500 to $600 per year above expenses. The plantation was run by Aaron Jones; the mill was mostly run on shares by different parties from year to year; the gin was run usually with wages hands, by some one as superintendent. Defendant managed the property and, so far as witness knew, received the income of it. The value of the live stock, wagon and buggy, as estimated by witness, was $555. Defendant took possession of both the real and personal estate of Gay, and used it as his own for 15 or 18 years. The mill and gin were run by water-power. The dam gave way a few times. Sanders put it in repair once or twice. The neighbors repaired it sometimes, and witness with his brother and some help that they hired repaired it four or five times. The family received none of the proceeds of the property, except bread corn from the mill, one load of oats in the sheaf and 25 pounds of flour. Witness paid all the funeral expenses of his mother, except for the coffin, which was home-made and cost $2 for the making. Witness and others lived on the place for about 21 or 22 years, but received none of the income of it except as just stated. Four children lived with his mother until they began to move off. M. A. Gay testified somewhat similarly, but stated that the horse was left on the place and the family cultivated about 10 acres of land around the house; that his mother made her own arrangements, bought her supplies and paid for them with the crops grown on said plantation by herself and plaintiffs; that the horse died and defendant let her have a mule for which she paid him with money from the crops raised by her and her children; that some of the hogs were used for plaintiffs' support, but they never got anything from the cattle or the sheep. Defendant had Aaron Jones to butcher the large ox, and most of the beef was sold; a part of it may have been used by the family. The ox was worth $60. Defendant got and used the hide of it. Plaintiffs had very little schooling; never as much as they were entitled to under the free school term. Dr. Rogers attended members of the family who were sick. Plaintiffs'

mother let him have some hogs in payment of his bill at one time. C. A. Sanders bought of defendant the large wagon belonging to the estate, and paid him $65 for it.

Defendant testified: He never took any of the property belonging to the estate from the place; left it there and does not know what became of it. His returns show what property he got and what he did with it, except the wagon sold to C. A. Sanders, the money for which was used in paying for plaintiffs' tuition and doctor's bills. Did not know who were the teachers or the doctors, except he paid Dr. Rogers's bills once or twice, nor how much was paid on these accounts. Did not know how long the children went to school, nor whether they went for more than the free school term or not. He frequently carried goods and provisions to the family; let them have over $100 worth of goods from his store; could not say to whom they were delivered. Never authorized Aaron Jones to kill the ox and carry off the beef, nor received any of the money for it; knows nothing of the hide. Had the widow buried decently; does not remember what he paid for her burial expenses, but furnished the lumber from his mill to make her coffin. Never had the sheep sheared nor got any wool from them; does not know what became of the cattle or goats; the hogs were used by the family. Never got anything from the mill or gin; the mill was not of much account; the dam was frequently broken. Did not remember to whom he paid the $83.50 for repairing the mill, nor why he got no receipts for the amounts paid. Had nothing to do with the land after Powell sold it. Furnished Jones who cultivated the land and worked on shares, and received four bales of cotton from him. Defendant himself delivered the goods and provisions to the family on several occasions. Plaintiffs had no income outside of the property on which they lived.

A special assignment of error is made upon the admission in evidence of defendant's annual return, already described; plaintiffs objecting thereto on the ground that under the circumstances the return was not prima facie correct, that as the authority under which defendant assumed to act as executor was void, he could not protect himself from his illegal acts by making returns thereof to the court of ordinary.

*R. H. Powell & Son*, for plaintiffs.

SIMMONS, C. J.    1. The paper upon which the defendant relied, as giving authority for his becoming executor, purported to be a last will and testament, but was attested by only one witness.   As a will it was void.   "All wills (except nuncupative wills) disposing of realty or personalty . . shall be attested and subscribed in the presence of the testator by three or more competent witnesses."   Civil Code, § 3272.   And in the case of *Thornton* v. *Chisholm*, 20 *Ga.* 338, this court held that an instrument attested by two witnesses only was void as a will.

A judgment of the court of ordinary, ordering the probate of such a paper attested by one witness only, gives that paper no effect as a will in any proceeding in which its validity may be called in question.   The court of ordinary is without jurisdiction to render such judgment, which is therefore void. "The will . . had been proven and admitted to record; and yet it had no attesting witnesses, as appears from the probate itself. . . . It is conceded that it had no subscribing witnesses.   The will was therefore utterly void, and of no effect.   It was competent, therefore, to move, at any time, to set aside the judgment of the ordinary admitting this paper to probate.   It was a nullity upon its face; and in favor of such a judgment nothing can be presumed."   *Hooker* v. *Stamper*, 18 *Ga.* 471:

"A will attested by only two witnesses is void, and can derive no aid from probate and being admitted to record.   The judgment of probate is not merely erroneous, but an absolute nullity on its face.   No motion to set it aside is requisite, nor is it ever too late to urge its invalidity."   *Cureton* v. *Taylor*, 89 *Ga.* 490.

2. While such a paper, though ordered to probate, is ineffective as a will, yet where certain heirs at law of an intestate agreed in writing to its probate as a will and under such agreement it was so probated by the ordinary and a named executor proceeded to dispose of the estate thereunder, such distribution would, because of the agreement, be binding on the heirs who were sui juris and consenting thereto, but minor heirs of the intestate would be in no way bound thereby.

By the agreement, those heirs who, being at the time sui juris, entered into it, are estopped to contest the validity of the paper probated or to attack the authority of the executor to whose appointment they have by their agreement consented. Clearly however this can not apply to minor heirs even though they may have entered into the written agreement, provided they revoke their act within reasonable time after their majority. A fortiori a minor heir is not bound or estopped where he was not a party to the agreement in question, even though he may, during his minority, have acquiesced in the arrangements made and raised no objection to them. These minor heirs being not bound by the agreement, the defendant was, as to them, executor de son tort and liable under section 3310 of the Civil Code.

3. In certifying the bill of exceptions the trial judge explains that the grant of the nonsuit was inadvertent, his intention having been to direct a verdict. This court must deal with the judgment of the court below as it appears in the record and can consider only the judgment there appearing. In this case, however, either the direction of a verdict or the grant of a nonsuit was error. The evidence was conflicting and was sufficient to have supported a verdict for the plaintiffs, and the case should therefore have gone to the jury.

*Judgment reversed. All the Justices concurring.*