COMER *v.* CITIZENS AND SOUTHERN NATIONAL BANK
*et al.,* executors.

No. 10827.   DECEMBER 10, 1935.
ADHERED TO ON REHEARING, MARCH 18, 1936.

*Little, Powell, Reid & Goldstein* and *Thomas W. Hardwick,* for plaintiff.

*Adams, Adams & Douglas,* for defendants.

BECK, Presiding Justice. Mrs. Hugh M. Comer Jr. brought an equitable petition against the executors and trustees under the will of Hugh M. Comer Sr., seeking to have established in her favor the title to a fractional share in certain property held by such executors and trustees, for discovery as to the exact interests, for partition of the share and delivery to her. The defendants filed a general demurrer, which was sustained and the petition dismissed. The case is here on exceptions to that order. The plaintiff is the widow of Hugh M. Jr., son of the testator, and claims his share under a deed executed by him to her and also by virtue of a will of Hugh M. Jr., in which he devised to her all his property. The case turns on whether Hugh M. Jr. had an interest in the estate held in trust, which was, during his lifetime, alienable by deed, or which was devisable by his will. The question presented requires a construction of the will of Hugh M. Sr. Those portions of the will which are here material are as follows:

"Item second: I give, devise, and bequeath unto my executors . . as trustees . . [certain securities], to be held by them in trust for the sole and separate use . . of my beloved wife . . for and during the term of her natural life only, paying over to her . . of the income therefrom regularly so long as she may live and remain my widow; but if she should see proper to marry again, then she shall receive from said income . . and from and after her death then said securities and the increase thereof, if any, shall go to and for the use of all my children born and to be born to me, share and share alike, under the terms, uses, and limitations as set forth in the third item of this my will. If my wife should so desire, the proceeds of a portion of said stocks may at any time be invested in a house and lot . . as a separate home for my wife, to be held on the same uses, terms, and limitations as the balance of said stocks given by this item. . .

"Item third: All the rest and residue of my estate I give, devise, and bequeath to my executors . . in trust for the use and benefit of all of my children, to wit [two sons and three daughters], and such other children, if any, as may hereafter be born to me, share and share alike, the child or children or lineal

heirs of a deceased child to represent the parent and to take per stirpes and not per capita, that is to say, the share of any male child born or to be born to me is to be held in trust by my executors till he shall have arrived at the age of 21 years, at which time one half of his entire share shall be paid over to him and the other half held until he shall have arrived at the age of 31 years, when said other half or balance, with the increase thereof, shall be paid over to him to be used and disposed of by him during his life as he may see proper; but in case such male child dies without issue, or lineal heirs then living, his share shall go to his surviving brothers and sisters, share and share alike, the child or children or lineal heirs of a deceased brother or sister to represent the parent and to take per stirpes and not per capita; and if none such, then to my own brothers, the child or children or lineal heirs of a deceased brother to represent the parent and to take per stirpes and not per capita; and the share of any female child born or to be born to me shall be held in trust by my executors for the sole use, benefit, and behoof of such female child for and during the term of her natural life only, and from and after her death then to such child or children as she may leave surviving her, the child or children or lineal heirs of a deceased child to represent the parent and to take per stirpes and not per capita, and in case such female child die without lineal heirs living at the time, then her share shall go to her surviving brothers and sisters, the child or children or lineal heirs of a deceased brother or sister to represent the parent and to take per stirpes and not per capita; and if none such, then to my own brothers, the child or children or lineal heirs of a deceased brother to represent the parent and to take per stirpes and not per capita."

Item four referred to the testator's dwelling, and on certain happenings the executors were to sell it and "divide the proceeds among my children, share and share alike, under the terms set forth in item third of this my will."

"Item fifth: It is my will and desire that the husband of any daughter or granddaughter of mine living at my death, or of any daughter or granddaughter of mine born within the usual period of gestation after my death, shall not take or control the property derived through me of such daughter or granddaughter, but the same shall be held by my executors in trust for the use of such

4

daughter or granddaughter during her life, and the same shall go to the child or children of such daughter or granddaughter; and if none such, to her brothers and sisters; and if none such, then to my own blood relatives . . as are nearest of kin to such daughter or granddaughter; and the same is my will in reference to the wife of any son or grandson, the child or children, or lineal heirs, living at that time, of any deceased child, grandchild, or brother to represent the parent and to take per stirpes and not per capita."

Item nine appointed as executors the wife, a brother, the son Hugh M. Jr., a friend, also another son when he became twenty-one years old; and provided that if the number of executors was reduced to two, a third should be appointed by those two. "In the making of such appointment my children or lineal descendants, if such; and if none, then my relatives are to be preferred."

The will was executed on April 4, 1899. The testator died on February 26, 1900. The widow did not remarry. The five children named in item third survived the testator. No child was born after the execution of the will. Hugh M. Comer Jr. was thirty-one years old when the will was made. No child was ever born to him, but he adopted one. He married the plaintiff in 1901, and died on April 9, 1934. The testator's widow died in October, 1934. In July, 1928, Hugh M. Jr. executed a deed to his wife (the plaintiff), conveying all property to which he was entitled under his father's will, specifically mentioning, among other details, the stocks scheduled in item 2 of the will. In this deed Hugh M. Jr. reserved to himself a life-estate in all the property covered by the will. In July, 1931, he executed a will making his wife his sole legatee and devisee. All of the property in terms referred to in item 3 of the will of Hugh M. Sr. was distributed; and it is conceded that Hugh M. Jr. received from his father's estate everything to which he was entitled, unless he had an alienable or devisable interest in the property conveyed by items two and four, which interest, if that be true, would now be vested in the plaintiff and recoverable by her in view of the termination of the life-estate which was in testator's widow. The position of the defendant in error is that Hugh M. Jr.'s interest in the trust estate (item two) terminated at his death; that the only interest which could pass to his wife by a deed made to her was his life-estate which was expressly reserved in the deed he executed; and that, no devisable interest existing, his will

was inoperative as to any interest in the trust estate. This view was concurred in by the court below.

In construing a will we are required to examine the paper as a whole, to search diligently for the intention of the testator; and if this be found, we must give effect to it unless it contravenes some rule of law. We must, if reasonably possible, harmonize and give effect to all parts of the will. If two portions are found irreconcilably inconsistent, the first must be discarded and the latter given effect. These rules are elemental. Every will should be studied from two viewpoints, one, of broad range, going to the document as a whole, the other a close-up scrutiny of every phrase it contains. Only by this double viewpoint can the true intent of a complex will be ascertained. While the broad-range consideration is the more important, we should not make the mistake of assuming too quickly that any particular phrase was carelessly inserted, or that the testator omitted any phrase which, had it been inserted, would have made his purpose clearer. We should give any separate phrase the weight it deserves when considered in connection with the entire plan of the will, or the plan of any distinct part of it, but no separate phrase should be magnified by microscopic scrutiny to the point of distortion of the underlying intent of the testator. As all wills differ, it has been said that each is a law unto itself. In several cases it has been recognized that when it comes to the construction of a will, precedents are of less value than is commonly true in other questions. In Smith v. Bell, 6 Peters, 80, Chief Justice Marshall approved the statement "That cases on wills may guide us to general rules of construction; but unless a case cited be in every respect directly in point and agreed in every circumstance, it will have little or no weight with the court, who always look upon the intention of the testator as the polar-star to direct them in the construction of wills." See also Cook v. Weaver, 12 Ga. 47, 50; Sumpter v. Carter, 115 Ga. 893, 896 (42 S. E. 324, 60 L. R. A. 274). These things being true, it is perhaps better, in seeking the intent of the testator, to study the will closely, in whole and in all its parts, before considering decisions which have been rendered in other cases involving wills of similar provisions.

One thing which appears clearly, to begin with, in the will before us, is that item 2 is linked with item 3. The two must be considered together. They are parts of the same definite plan.

Items 2 and 3 dispose of the entire estate, with the exception of the relatively inconsiderable portion referred to in item 4; and even item 4, in express terms, is linked with item 3. Therefore item 3 is our first and main objective. So far as the *quantity* of the estates taken under the will by the testator's children is concerned, there is no particle of difference between 2 and 3. The sole difference is one relative to *time* of enjoyment. By item 2 the testator separated one part of his estate from the other, and in this first portion created a life-estate for the benefit of his widow. But when this life-estate ended, the property there involved was to go "to and for the use of all of my children . . under the terms, uses and limitations as set forth in the third item of this my will." There can therefore be no doubt that whatever interest existed in a son of testator on his father's death, in his share of the property embraced within the terms of item 3, was exactly duplicated by a similar interest in the remainder set up in item 2. If the one was vested, the other was. If the one was unrestrictedly alienable, the other was. He was to get possession of one half his share of the property covered by item 3 when he was 21 and the other half when he was 31 years old; but no matter how old he was, he could not get possession of his share of the stocks mentioned in item 2 until his mother was dead. As stated, the difference is only one of time of enjoyment. The estates themselves, by the express terms of item 2, are identical. This consideration brings us to the all-important question: What were the estates created by item 3? Examining item 3, we note at once that the estates given the sons are radically different from those given the daughters. The corpus of the latter was never to vest in possession in the daughters; the corpus of the former did vest in possession, one half at age 21 and one half at age 31. The words "for and during the term of her natural life" appear in connection with the daughters' interests; there are no similar words anywhere relative to the sons' interests. The bequest to the daughters was of income only; the bequest to the sons was of the property itself. Evidently the testator feared the inexperience in business of his daughters, and knew their protection could only be assured by letting the trustees retain possession and management during the lives of the daughters.

All that portion of item 3 relative to the son is in one long sentence punctuated only by commas. We examine first the words,

"to be used and disposed of by him during his life as he may see proper." These words immediately follow the direction given the executors to pay over to the son the second half of "his entire share" when he reaches 31 years. What, then, is the character of the estate here contemplated? A fee, or an estate for life? We think a fee. As above indicated, there is no mention of any estate for life as to the sons. The language down to the words, "to be used and disposed of by him during his life as he may see proper," is entirely inapplicable to any estate other than a fee. Is it then to be assumed that the words last quoted reduce the estate to one for life? We think not. One who owns a life-estate has the right to use and dispose of it during his life, without anything being said about a power of alienation. If the testator desired each son to have no more than a life-estate, and to have power to dispose of no more than a life-estate, then the quoted words are redundant.

We next reach the phrase, "but in case such male child dies without issue, or lineal heirs then living, his share shall go to his surviving brothers and sisters . . " Do these words reduce to a life-estate the fee which we have found was so clearly expressed up to that point? We do not think so. The fact that the testator was so careful to insert the words "during the term of her natural life *only*," when he creates the daughters' estates, whereas there is an entire absence of similar words where he is dealing with the shares going to the sons, is to our minds of great force. Had he intended a life-estate in the sons as well as in the daughters, he would not probably have taken the sons' shares out of the trust until the sons were dead. He would not have provided for delivering one half to a son at age 21 and the other half at age 31. But even assuming that he would have ended the trust as to the sons, had a life-estate only been intended he would have inserted the words, "to be held and enjoyed by such son for the term of his natural life only," or some similar provision, immediately after the direction to deliver the one-half share to the son at age 21. The phrase, "to be used and disposed of by him during his life as he may see proper," does not indicate an intention to reduce the fee just created. These words are not to be considered the legal equivalent of the clear language the testator employs in creating the life-estates for the daughters.

In item 3 are two clauses containing words of survivorship. We

think both should be referred to a death before testator's death. Code of 1933, § 85-708. The first clause, "the child or children or lineal heirs of a deceased child to represent the parent," covers the case of a child dying before the death of the testator, leaving a lineal heir; the second, "but in case such male child dies without issue or lineal heirs then living, his share shall go" . . covers the case of a son dying before testator *without* leaving a lineal heir. This conclusion is consistent with cases heretofore decided by this court, to which we shall refer later. But considering the will before us as a law unto itself, the terms of item 3 demand the construction we have put upon it. In dealing with the shares given to the sons, there is no obligation on any one of them to keep his share intact for the benefit of any subsequent possible holder. It is to be "paid over to him," undoubtedly free from all trust features, "to be used and disposed of by him during his life as he may see proper." So, a vendee, mortgagee, or exchangee of the son would be protected under this clause. Any son could sell, mortgage, use, consume, or even fritter away his entire share, and no one could object while the process was going on. Yet the reference in the clause last above quoted from item 3 is that "his share" shall go in the way directed. This undoubtedly means the share existing at the testator's death—the share a son, dead at testator's death, would have taken had he been alive at testator's death. At the death of a son who had survived his father and received his share, there might be no share left. No steps were taken by the testator to preserve it. The circumstances are of interest here, and in all such cases they may be considered. Code of 1933, § 113-807. Hugh M. Jr. was 31 years old when the will was executed. The testator knew that as to all property passing at once under item 3 this son would get his entire share on testator's death; and if the widow died soon after the death of her husband, Hugh M. Jr. would immediately receive his part of the property passing under item 2; yet the testator trusted him with the full possession of all of it. No trust estate ever existed for Hugh M. Jr. as to the property embraced within item 3. The testator relied on the steadiness and character of this son to the extent of making him an executor. He could scarcely have exhibited greater confidence in him.

We have reached the above conclusions by an independent study of item 3 of the will and its own special language; but we may note

here that these conclusions are in harmony with other decided cases. In *Wilcher* v. *Walker*, 144 *Ga.* 526 (87 S. E. 671), items 1 and 2 of the will there presented gave to the testator's brother certain property; nothing was said about a life-estate, and on the other hand nothing was said about a fee; item 3 provided that should this brother die without leaving a child, the estate should go to the testator's next of kin. It was held that these words of survivorship referred to testator's death; and the brother having survived the testator, his deed to another passed good title, although later the brother died without leaving a child. The court ruled that the definite bequests in items 1 and 2 (although the words "fee simple" did not appear) created fees which were not cut down to life-estates by the terms of the following item. The case was carefully considered, and many authorities were cited, to which we refer the reader. See also *Moore* v. *Cook*, 153 *Ga.* 840 (113 S. E. 526). We may here consider further the true scope of the words "to be used and disposed of by him during his life as he may see proper." The verb "use," standing alone, does not imply a particularly broad power of disposition. See Re Dorgan's Estate (D. C.), 237 Fed. 507, 508, where there was a definite life-estate, a definite remainder, and a power in the life-tenant "to use" without let or hindrance. It was held that the language did not embrace a broad power of disposal for purposes other than the beneficiary's own use, although there was a further provision that she might "sell and convey any real estate left by me." Clearly the right to give the property away was not covered. But the word "use" must always be regarded in the particular connection in which it appears, (66 C. J. 66); and when coupled with the words "and dispose of," the scope is greatly broadened. The expression "dispose of" usually includes a power of gift. 18 C. J. 1280, and cit. When we add the words "as he may see proper," additional breadth is given. The entire statement, "to be used and disposed of by him during his life as he may see proper," is, to our minds, almost as broad as testator could make it. We construe the phrase, "to be used and disposed of by him during his life as he may see proper," as applied to Hugh M. Jr., to mean that during his life Hugh M. Jr. had the power to consume, sell, mortgage, or give away the fee in this property, as he might desire.

We come next to a consideration of the fifth item of the will. The contention of the defendants, as we understand it, is that even granting that item 3 created a fee in Hugh M. Jr., the provisions in the fifth item as to "any son" are such as to require a holding which bars his wife, under all circumstances, from taking any property which the son derived from the testator; further, that the language of item 5 is directly antagonistic to the idea of a fee having been created by item 3, and being later must control. Defendants contend that the clause in item 5, beginning with the words "and the same is my will in reference to the wife of any son or grandson," requires a rewriting of the concluding lines of the item, as follows: "It is my will and desire that the wife of any son of mine living at my death shall not take or control the property derived through me of such son." Granting this to be true, the situation is not changed. Items 2 and 3 were evidently prepared with deliberation and care. It is going too far to say that after framing the estates under 2 and 3 as he did, the testator by item 5 annihilated or radically modified any of them. Items 2 and 3 create definite estates. Item 5 creates no estate of any kind whatever. The situation here presented is almost identical with that which arose in *Allen* v. *Trust Co. of Ga.,* 147 *Ga.* 739 (95 S. E. 288). It is not always true that a will works out according to the personal preference of the testator. Sometimes his clearly expressed wish is thwarted. One instance, occasionally arising, is an attempt to create a perpetuity. This can not be done. Another follows from the fact that certain legal results inevitably follow certain situations, irrespective of whether the testator desires or does not desire such results.

If it be true, as we are deciding, that both the remainder held by Hugh M. Jr. under item 2 and the residuary share held under item 3 were fees, disposable by him during his life as he saw proper, and Hugh M. Jr. during his lifetime did dispose of these estates by giving them to his wife, then his wife's title is good, notwithstanding the provisions of item 5. *Allen* v. *Trust Co. of Ga.,* supra, is directly in point. There the testator, Ryan, in his will stated: "I desire, and by this clause most positively direct, that under no circumstances shall my nephews, . . or any of their issue, receive the slightest benefit from any portion of my estate; only shall my children and heirs of their body." And he provided for an ultimate disposition, on failure of his own line, to

charity. But previously in his will he had created certain indefeasible estates; and what happened later passed the final title, by inheritance, to the very persons whom he had expressly stated should never receive it. See also *Haralson* v. *Redd,* 15 *Ga.* 148. And so in the case at bar, the legal situation resulting from what we believe is the true construction of items 2 and 3 having been followed by what appears to us to be a valid disposition by Hugh M. Jr. to his wife, that disposition must hold, notwithstanding the terms of item 5. We find no later case questioning *Allen* v. *Trust Co.,* and in our opinion the decision is sound.

We wish to emphasize the statement made above, that items 2 and 3 create definite estates; whereas no estate whatever is created by item 5. We are not here presented with a case of irreconcilably conflicting bequests which would, under the usual rule, require us to give effect to the one last appearing in the will. No bequest is contained in item 5. The first half of this item (referring to the daughters) is in effect an exact reiteration of what the testator had already provided in item 3. The second half (referring to the sons) is also a reproduction, in effect, of prior provisions in item 3 relative to the sons. The last lines of item 5 show that our conclusion above, that the survivorships appearing in item 3 are referable to the death of the testator, is correct. The language is that the child, "living at *that time,* of any deceased child," shall represent the parent. The only date mentioned in the item to which the words "that time" can apply is the one which is contained in the phrase "living at my death," in the second line of the item. This consideration would seem to remove all doubt as to the question presented.

In concluding our general discussion of items 3 and 5 we may add that the Code of 1933, § 85-501, provides: "An absolute or fee-simple estate is one in which the owner is entitled to the entire property, with unconditional power of disposition *during his life* [italics ours], and which descends to his heirs and legal representatives upon his death intestate." The words "during his life" are reproduced in the power which appears here in item 3 so clearly they are not susceptible of some strained implied construction, such as a prohibition against alienation by will at death, for which the testator could have no possible reason that we can see. The Code of 1933, § 85-503, says that "Every conveyance, properly executed,

shall be construed to convey the fee, unless a less estate is mentioned and limited in such conveyance. If a less estate is *expressly limited* [italics ours], the courts shall not, by construction, increase such estate into a fee," etc. It can not be contended here that any estate less than a fee is mentioned or expressly limited in the creation of the sons' estates in item 3 of the will before us. The present language of sections 85-501 and 85-503 is practically identical with the first half of section 3081 and all of section 3083 of the Code of 1895, the Code which was in use by lawyers when the will now before us was drawn. It is altogether possible that the draftsman of this will, when he drew it, had before him these sections of the Code of 1895, and provided for the payment to the son (unrestrictedly) of his entire share at age 31, and then inserted the words "to be used and disposed of by him during his life as he may see proper," as a compliance with the language of Code of 1895, § 3081: "An absolute or fee simple estate is one in which the owner is entitled to the entire property, with unconditional power of disposition during his life."

None of the cases cited by defendants requires a conclusion different from that we have reached. Many of the cases cited are distinguishable on their peculiar facts, and need not be referred to here. The cases most strongly relied on as requiring a decision that the deed and the will executed by Hugh M. Jr. were ineffective are *Taylor* v. *Phillips,* 147 *Ga.* 761, 770. (95 S. E. 289), *Cochran* v. *Groover,* 156 *Ga.* 323 (118 S. E. 865), and *State Highway Board* v. *Price,* 174 *Ga.* 143 (162 S. E. 283). We have carefully examined these cases, and do not find them, in essence, opposed to the conclusion we have reached in the case at bar. What is said in those decisions is of course to be considered in the light of the facts presented. In *Taylor* v. *Phillips* there was a conveyance to a trustee for the lives of the grantor and his wife, and at the death of the survivor the property was to be divided among the children. The deed provided that the trustee named should, on the written request of the wife, "sell and convey" the property to such person and on such terms as she might direct, and that the receipt of the wife for the purchase-money should be a complete discharge to the trustee. This language is altogether different from that now before us. "Sell and convey," with a reference to "purchase-money" would clearly not embrace a power to make a voluntary

gift. And that is all that the court decided in that case. In the opinion it was stated that the deed was to be considered in its entirety, that it clearly created life-estates and vested remainders which were subject to be divested only by an actual bona fide sale made on a valuable consideration, and that the grantor did not contemplate the defeat of the remainder by a mere gift. With these conclusions we fully agree; but the case before us is quite different. Here the word "sell" does not appear in the power. The language is far broader. Stress is laid by counsel on the fact that in the *Taylor* case this court approvingly referred to Garland *v.* Smith, 164 Mo. 1 (64 S. W. 188) ; but the language of the deed there involved was not a parallel to that of the will presented here. In the Garland case the power was to "sell, mortgage, encumber, lease, or otherwise dispose of." Clearly the words "or otherwise dispose of" are there ejusdem generis. (See 147 *Ga.* 766.) A sale, a mortgage, an encumbrance, a lease, would each be productive of money. (147 *Ga.* 765.) A gift is far removed from any of those specified dispositions; consequently the general phrase which followed, "or otherwise dispose of," was properly referred to a disposition of the same character; one which would produce money or its equivalent. In the case at bar the expression is "to be used and disposed of . . as he may see proper." To "use" frequently means to consume. Considering the known hazards of business, the testator here must have recognized the possibility that his sons might lose all the property bequeathed to them; yet he took no pains to preserve their shares, as he did those of the daughters.

Much that we have just said with reference to *Taylor* v. *Phillips* is applicable to *Cochran* v. *Groover* and *State Highway Board* v. *Price*. In the *Cochran* case the power in the will was "to sell or dispose of" the property and on her death it was to go etc. It was held that the power quoted did not enlarge her life-estate into a fee, and that her attempt to devise the property herself was inoperative. On page 339 of the 156 *Ga.* appears the statement, "The power to sell does not include a power to give. The phrase, 'or dispose of,' does not confer such power." No authorities are cited in this immediate connection, and the real meat of the decision is at the bottom of page 339 and top of page 340: "The clear intention of the testator was that such of his property as remained at the time of the marriage or death of his widow should pass under his will

and not under her will. The power given the life-tenant was one of disposition by act inter vivos, but not by will." *State Highway Board* v. *Price* may be passed with the same observations made above as to *Taylor* v. *Phillips*. The power there involved was "to dispose of any of said property by sale or otherwise." In *Broach* v. *Kitchens,* 23 *Ga.* 515, the court construing the entire will came to the conclusion that the estate in the widow was one for life only, and the power of disposition was limited to that. In the will there was a provision that the property after her death should be divided among the children. That case is not at all like the one at bar. It was explained in *Mayo* v. *Harrison,* 134 *Ga.* 737 (68 S. E. 497). The facts of *Hudson* v. *Perry,* 167 *Ga.* 790 (146 S. E. 635), *Cooper* v. *Mitchell Investment Co.,* 133 *Ga.* 769 (66 S. E. 1090, 29 L. R. A. (N. S.) 291), *Dean* v. *Wall,* 154 *Ga.* 637 (115 S. E. 78), *Dudley* v. *Porter,* 16 *Ga.* 613 , *O'Byrne* v. *Feeley,* 61 *Ga.* 77, *McCoy* v. *Olive,* 168 *Ga.* 492 (148 S. E. 327), and *Belt* v. *Gay,* 142 *Ga.* 366 (82 S. E. 1071), were entirely different from those here presented. In *Slappey* v. *Vining,* 150 *Ga.* 792 (105 S. E. 353), the instrument involved was a deed, and not a will, and the question of the death to which the words of survivorship should be referred was not presented. In *Hill* v. *Terrell,* 123 *Ga.* 49 (51 S. E. 81), the words involved were "if . . should depart this life *after marriage."* Clearly there could be no question of reference there. The only vital matter was whether the fee was absolute or base. This case is referred to in *Wilcher* v. *Walker,* 144 *Ga.* 528 (supra), which is so strongly relied on (and we think justifiably) by the plaintiff here. In *Moore* v. *Cook,* 153 *Ga.* 840, 842 (supra), the words of survivorship were referred as we are referring those in the case at bar. The case of *Patterson* v. *Patterson,* 147 *Ga.* 44 (92 S. E. 882), was discussed, in which emphasis was put on the adverb "then" as it there appeared. But the word "then" in the *Patterson* case occurred in a connection entirely different from the way it appears here. There the sentence was as follows: "If the said Mary Jane Patterson should die without child or children, *then* the property" shall go, etc. This was held to mean that on death of Mary Jane *at any time,* without a child, the property would would go, etc. But in the case at bar the language is, "but in case such male child dies without issue, or lineal heirs *then* living," etc. This is altogether different. The word "then" here refers to

issue or lineal heir of testator's son living at the death of the son, but it is none the less true, under the Code rule above referred to, that the word "dies" as used in the phrase next preceding, means "dies before I die."

In concluding this part of the opinion we should note that estates by implication are not favored; and that every conveyance should be construed to convey the fee, unless a less estate is mentioned and limited. *McCord* v. *Whitehead,* 98 *Ga.* 381, 385 (25 S. E. 767); *Sumpter* v. *Carter,* 115 *Ga.* 893, 900 (supra); *Felton* v. *Hill,* 41 *Ga.* 554; *Munford* v. *Peeples,* 152 *Ga.* 31 (108 S. E. 454).

It is argued with great earnestness by counsel for defendants, that, viewing the will as a whole, the appearance in various places of the words "my own blood relatives," "my own brothers," etc., indicate a definite discrimination in favor of persons of testator's own blood and against "in-laws," husbands of daughters and wives of sons. But we are of the opinion that the weight of this argument is not sufficient to overthrow what we conceive to be the true meaning of items 2, 3, and 5, and the definite estates created by 2 and 3.

In the petition mention is made of an allegedly adopted daughter of Hugh M. Jr. She is not a party to the case, and is brought into it in an effort to show that Hugh M. Jr. did not die without a child, and therefore, in any event, an estate in collaterals of Hugh M. Jr. could not exist under item 3. What we have heretofore decided makes it unnecessary to determine the legal status of this child.

The petition stated a cause of action and the court erred in dismissing it on demurrer.

*Judgment reversed. All the Justices concur, except Atkinson, J., who dissents, and Gilbert, J., disqualified.*

Russell, C. J., concurs in the result, but not in all that is said in the opinion.

Mr. Justice Atkinson participated in the hearing on oral argument and in the decision upon which error was assigned. His disqualification to preside did not appear from the record, and he did not know of such disqualification until after the decision and the filing of the motion for a rehearing, nor until the ground of his disqualification was stated in the reply brief of the attorneys for the respondent, filed February 12, 1936, opposing the grant of a

rehearing.  Upon discovery of the facts he declined to participate further in the case.

When this case was called for argument before Presiding Justice BECK and Justices ATKINSON and GILBERT, Justice GILBERT called to the attention of counsel the fact that if the Citizens and Southern National Bank was an interested party he would be disqualified from participating, Mrs. Gilbert owning a few shares of stock in the bank.  Thereupon counsel for the defendants in error insisted that the bank was not actually interested, but was a party merely by reason of being a trustee for the estate.  Counsel for the plaintiff in error stated that the bank was to a small degree interested, but that the disqualification was waived.  After some discussion Justice Gilbert announced that he would remain on the bench during the argument, but would determine later, after conferring with his associates, whether or not he should participate.  After such conference Justice Gilbert declined to accept the waiver, and recused himself on the ground that one of the parties maintained that the bank had some interest in the result, and that neither he nor the court could determine from the record what was the actual fact as to the interest of the bank.

After the rendition of the judgment by five Justices, a motion for rehearing was made, in which the matter of the aforesaid disqualification was again discussed, it being insisted that the bank was not interested and that Justice Gilbert was not disqualified. The matter being brought to the attention of the court, the clerk was ordered to notify counsel for both sides that the court desired to hear from them as to such disqualification.  Both parties filed briefs.  The defendants in error insisted, as at all times previously, that the bank was not interested. The brief for the plaintiff in error again stated that the bank was interested, using the following language:  "We can not truthfully say that in our opinion, under the allegations and prayers of the petition, the bank has no theoretical interest in the suit, because the bill prays for an accounting against the bank as trustee, and because the decision of the questions involved in the construction of the will may affect the bank's commissions, especially as to the amounts which will be left in their hands under the trusts for the testator's daughters.  Nevertheless the truth is that, from a practical standpoint, the bank's interest is so small as to make us consider it negligible.  If the will be con-

strued in our favor, we have no apprehension that the court will ever have to make or enforce an accounting." After the brief containing the foregoing quotation was prepared there was attached what is called an "additional statement as to disqualification of Mr. Justice Gilbert." It is then stated: "Since the accompanying brief was prepared, we have heard from our client, to whom we sent a copy of the court's order. We now find it necessary to state to the court that she insists that the interests of the Citizens and Southern National Bank are greater than we have stated to the court. She differs from counsel on the proposition that it will probably not be necessary for the court to act on the prayer for an accounting, as she does not think that counsel for the parties will be able to agree, especially as to the compensation and allowances to the trustee. She thinks that an actual controversy is involved." Counsel for the plaintiff in error expressly stated in every instance that notwithstanding the actual disqualification, the same was waived by the plaintiff in error. After again considering the matter, and the actual facts not being ascertainable from the record, Justice Gilbert deemed it his duty not to accept the waiver, and to recuse himself because of the disqualification.

ON MOTION FOR REHEARING.

In view of the disqualifications referred to in the preceding memoranda by Justices Atkinson and Gilbert, the Governor was requested to designate two judges of the superior courts to preside in the further consideration of this case, for the purpose of determining whether the motion for rehearing should be granted, and, if the motion should be granted, for the purpose of determining the whole case de novo as brought to this court. Honorables John D. Humphries and Virlyn B. Moore, judges of the superior courts of the Atlanta Circuit, were designated by the Governor, and presided on an oral reargument of the case on March 14, 1936. Upon consideration of the case by the court as thus constituted, it is ordered that the former judgment be adhered to. Chief Justice Russell, Presiding Justice Beck, Justice Bell, and Judges Humphries and Moore concur. Justice Hutcheson withdraws his former concurrence, and dissents. His opinion follows:

HUTCHESON, Justice, dissenting. I can not concur in the opinion of the majority of the court. The cardinal rule for the construction of wills is to ascertain the intention of the testator.

Courts are commanded to seek diligently for this intention, and to this end may transpose sentences or clauses, change connecting conjunctions, or even supply omitted words, in cases where a clause as it stands is unintelligible or inoperative and the proof of intention is clear and unquestioned. When the testamentary purpose is determined, it must be given effect, unless it contravenes some positive rule of law. Code of 1933, § 113-806. In ascertaining the intention of a testator, we must look to the entire will, and not to fragmentary portions of the document. The majority opinion correctly applies the limitation of item 3 of the will to the trust estate created by item 2. It was the manifest purpose of the testator that the property devised to his wife for life should go to his children at her death, but that it should pass to them subject to all of the restrictions and limitations imposed by item 3 upon the properties willed directly to them.

Item 3, which is the controlling provision of the will, in substance provides that the residue of the estate of the testator shall be divided equally, share and share alike, among his children, that one half of the entire share of each son "shall be paid over to him" when he arrives at his majority, and that the balance "shall be paid over to him" when he arrives at the age of thirty-one years. No power of disposition is given to the daughters. The property passing to each son, however, when it is paid over to him, is "to be used and disposed of by him during his life as he may see proper." Immediately following this provision of item 3 the will directs the disposition to be made of the property which becomes vested in possession to the sons in the event either of them dies without issue or lineal heirs *then living*. Construing this provision of the will in its entirety, as must be done to arrive at the true purpose of the maker, the testamentary intention is plain. The language used clearly discloses the purpose of the testator to create in each son a life-estate in the property "paid over to him," with remainder over to the surviving brothers and sisters of such son in the event he should die without issue or lineal heirs living at the time of his death, but that such son should have the unrestricted right to use and dispose of the property during his life. This construction is fortified by the provisions of item 5. While the language there used is somewhat loose, it clearly demonstrates the intention of the maker of the will that his property shall be held in

his family to the exclusion of any spouse of any son or daughter. It can not be said, however, that the loosely drawn restriction embodied in item 5 limits the power of disposition expressly granted to the sons by item 3. It is my opinion, construing the will in its entirety, that Hugh M. Comer Jr. took only a life-estate in the property which passed to him under item 3 of the will, but that the will vested in him an absolute power of disposition which enabled him to convey the fee in such property to his wife. I think his deed to his wife operated to vest in her the absolute title to all of the property of which Hugh M. Comer Jr. was then possessed under item 3 of the will.

I do not think, however, that the unrestricted power of disposition extended to his remainder interest in the property willed to the widow of the testator for life. As to this property, I think the remainder interest which became vested in Hugh M. Comer Jr. was divested upon his death, never having become vested in possession, and that it passed to his brothers and sisters, or their children upon the death of the life-tenant. It seems clear to me that the power of disposition which item 3 gave to the sons extended only to the property "paid over" to them pursuant to that item, and that it was never the intention of the testator that it should extend to the property which formed the trust estate set apart for the use and benefit of the widow during her life. The fact that Hugh M. Comer Jr. was already thirty-one years of age when the will was executed does not require a contrary holding. Rather does it strengthen the view just expressed, since the property willed to the wife for life under item 2 was the only property which would not at once be "paid over" to this son.

I can not agree to the interpretation of item 3 as set forth in the majority opinion, that the contingency under which the share of a son should pass to his surviving brothers and sisters must have arisen before or at the time of the death of the testator. Construing the will in its entirety, as should be done, a contrary testamentary intent plainly appears. It is my opinion that the widow of Hugh M. Comer Jr. is entitled to the property which he deeded to her and the possession of which was then vested in him. Since it appears that Hugh M. Comer Jr. died before the death of the widow of the testator, I am of the opinion that neither the deed executed by him to his wife, nor his will, could operate to pass any

title to the property then held by the widow of the testator which had never vested in possession in him. The widow of Hugh M. Comer Jr. has no interest in this fund. In view of what has been said, it is not necessary to make any reference to the will of John D. Comer, or to any possible effect which his will may have had upon the interests of the parties here involved.

I am not unmindful of the well-established principle of law that a vested-remainder interest is ordinarily subject to conveyance. I think, however, that the vested-remainder interest of Hugh M. Comer Jr. in the trust estate was subject to be divested upon his dying without lineal descendants. It seems undisputed that he did die without lineal descendants. There can be no serious contention that the adopted child is a lineal descendant. In so far as the petition sought to assert the right of Mrs. Hugh M. Comer Jr. to the property disposed of by item 3 of the will of Hugh M. Comer Sr., it stated a good cause of action; but in so far as it sought to assert her right to the property dealt with in item 2 of the will, it was subject to the demurrer interposed. Since the judgment of the court sustained a general demurrer and dismissed the petition, it may be that the judgment should be reversed. But direction should be given to determine the respective rights of the parties litigant in accordance with what seems to me to be the clear intent and purpose of the testator.